**IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA**

| | | |
|---|---|---|
| **STEWART SHERK, *et al*.** | : | **CIVIL ACTION** |
| | : | |
| **v.** | : | |
| | : | |
| **COUNTRYWIDE HOME LOANS, INC., *et al*.** | : | **NO. 08-5969** |

<u>**MEMORANDUM OPINION**</u>

**Savage, J.**                                                              **August 5, 2009**

In this action arising out of a mortgage transaction in connection with the purchase of a new home and a subsequent refinancing, the plaintiffs primarily allege that they were induced to enter the transaction by false promises and that the terms of the loans were different than promised.  In their second amended complaint naming eight defendants, they assert a federal cause of action against two defendants and two claims under Pennsylvania law.[1]  The defendants have moved, under Fed. R. Civ. P. 12(b)(6), to dismiss the second amended complaint for failure to state a claim.

After realizing that their federal statutory claims under the Truth in Lending Act, as amended by the Home Ownership and Equity Protection Act, ("TILA")[2] and the Real Estate Settlement Procedures Act ("RESPA")[3] were barred by the statute of limitations, the plaintiffs attempt to salvage their federal action by continuing to assert a claim under the Federal Debt Collection Practices Act ("FDCPA")[4] against the assignees of the mortgage. They seek to create a federal hook to keep this action asserting state causes of action in

---

[1]  The plaintiffs conceded to the withdrawal of a third claim under Pennsylvania law at oral argument.

[2]  15 U.S.C. § 1601, *et seq.*

[3]  12 U.S.C. § 2602, *et seq.*

[4]   15 U.S.C. § 1692e, *et seq.*

this court.  Their attempt fails as a matter of law and the federal claim must be dismissed.
Rather than decline supplemental jurisdiction over the state law claims, we shall consider
and dismiss them also because they cannot withstand the defendants' Rule 12(b)(6)
challenges.  Therefore, the motions to dismiss will be granted and this action will be
dismissed.

### Factual Background[5] and Procedural History

On December 15, 2005, the plaintiffs, Stewart and Stacy Sherk ("Sherks"), entered
into a loan transaction ("2005 loan")  with Countrywide Home Loans, Inc. ("Countrywide")
to finance the purchase of a new home from Gambone Construction Company
("Gambone").   In connection with the loan, they executed a mortgage and note.   The
Sherks refinanced this loan on June 1, 2006 ("2006 loan").[6]

Countrywide sold the 2006 mortgage to HSBC Bank USA, N.A. ("HSBC") and Alt-A
Securities Mortgage Loan Trust ("Alt-A").  *Id.* ¶¶ 76, 79, 80.[7]   After the Sherks defaulted
on the loan, HSBC and Alt-A initiated a mortgage foreclosure action in state court on

---

[5] The facts recited throughout this memorandum opinion are taken from the Sherks' second amended complaint.

[6] The second amended complaint states that the Sherks refinanced the 2005 loan "with Mortgage Broker," which had previously been defined as defendant Vince Sirianni, a representative of Bi-Weekly Mortgage Corporation ("Bi-Weekly").  *See* 2d Am. Compl. ¶¶ 13, 51. It does not allege any involvement by Countrywide in the refinance.  Because the complaint later discusses the transfer of the loan from Countrywide to HSBC and Alt-A, however, it is presumed that Countrywide actually refinanced the loan in June 2006, with the assistance of the mortgage broker defendants, who "acted as an intermediary . . . [in] securing and sourcing the subject Loan[s]."  *Id.* ¶ 20.  Additionally, the complaint does not state clearly which loan is the "subject Loan [sic]."   It appears that the Sherks complain about both transactions.  *See also* 2d Am. Compl. ¶ 27 (referencing a single "loan"); *id.* ¶ 60 (defining the Sherks' Dec. 15, 2005, loan as the "Purchase Loan"); *id.* ¶ 61 (defining the Sherks' June 1, 2006 loan as the "Refinance Loan" or "Defaulted Loan"; *id.* ¶ 63 (stating that the Sherks' multiple "loans closed on the dates above-indicated"); *id.* ¶ 72 (stating that the Sherks' single "loan closed on the date above indicated").

[7] Certain allegations sound as though MERS was the entity that sold the 2006 loan.  The relationship between the defendants is not explained in the second amended complaint.

2

February 19, 2008.  After default judgment was entered, the property was sold at a foreclosure sale on June 25, 2008.  The Sherks then filed this action.

The plaintiffs assert four causes of action arising out of the financing of the purchase of a new home and the later refinancing of that loan.  The only federal cause of action is brought under the FDCPA against HSBC and Alt-A, who foreclosed on the mortgage.  The remaining claims are brought under Pennsylvania state law.  The Sherks seek: (1) the "[r]eturn of any money given by [the Sherks] to anyone, including Defendants, in connection with the transaction";[8] (2) "forfeiture and return of loan proceeds"; (3) statutory, actual, compensatory, treble, and punitive damages; and (4) attorneys fees and expenses.[9]

The first cause of action, which is against all defendants, is brought under Pennsylvania's Unfair Trade Practices and Consumer Protection Law ("UTPCPL").[10]  After listing prohibited practices recited in the statute without any factual content, the Sherks allege as "additional violations" of the UTPCPL violations of TILA and RESPA.  These claims had previously been stated as independent causes of action in the original and the first amended complaint.[11]

---

[8]  It is not clear which particular transaction the Sherks are referencing as the complaint appears to address (1) a 2005 initial loan and (2) a 2006 loan that refinanced the 2005 loan.  Regardless, the Sherks will be limited to recovery against the defendants; recovery against entities not named as defendants is not an available remedy.  Additionally, the Sherks' complaint essentially seeks rescission of the loan, which is not directly available under any of the statutes at issue.

[9]  The Sherks have also requested "[w]age loss and loss of earning capacity."  2d Am. Compl. ¶ 3(a)(vii).  It is unclear how such relief would remedy an action for predatory lending.

[10]  73 Pa. Cons. Stat. §§ 201-1, *et seq.*

[11]  Plaintiffs' counsel admitted at oral argument that the TILA claim was dropped as an independent cause of action after the defendants moved to dismiss on the technicality that the plaintiffs, who no longer own the property after foreclosure, cannot bring a TILA claim.

The second and third causes of action are against HSBC and Alt-A, as the "foreclosing entity" and the "additional foreclosing entity," respectively. The second count, brought under the FDCPA, is the only federal cause of action asserted in this action. The third count is brought under Pennsylvania's Fair Credit Extension Uniformity Act ("FCEUA").[12]  The fourth cause of action is against Gambone only for fraud and fraudulent misrepresentation.[13]

The complaint named "John Does 1-10" as defendants. Other than in the section identifying the parties, the John Does are not referenced in the complaint. They are not mentioned in any of the factual allegations or the various counts. Nor are they connected to any named party. In short, there are no acts or omissions attributed to the "John Does."

In an incoherent and sometimes incomprehensible second amended complaint containing innumerable grammatical errors and misspellings, the Sherks make contradictory and confusing allegations. The following summarizes the crux of their allegations.

The Sherks allege that they were promised certain loan terms to purchase a new home constructed by Gambone. When the original property was no longer available,[14] the Sherks "were forced" to purchase a more expensive lot, because they "could not afford to lose their down payment" of "approximately $15,000 - $20,000." 2d Am. Compl. ¶¶ 29-30,

---

[12]  73 Pa. Cons. Stat. § 2270.1, *et seq.*

[13]  Plaintiffs' counsel withdrew this fourth cause of action for fraud and fraudulent misrepresentation at oral argument.

[14]  Gambone Construction sold the property that the Sherks originally sought to purchase to another buyer despite the Sherks having paid a down payment and signed an agreement of sale. 2d Am. Compl. ¶¶ 30, 33.

35-37.  Then, the "Mortgage Brokers[15] advised [them] that the terms of their loan would be different than originally promised."  *Id*. ¶¶ 38-40.[16]  Rather than $2,300 per month, the Sherks learned that their monthly payments would be $3,400, "containing payments toward interest only."  *Id*. ¶ 40.  Contrary to their allegation that they could not afford to lose their down payment, the Sherks aver that they advised the mortgage brokers that they "would be cancelling the loan as the newly proposed loan was long-term unaffordable and of no benefit as interest only."  *Id*. ¶ 41.

According to the Sherks, "Mortgage Brokers promised to refinance [the Sherks] out of the loan about one (1) month later (in January 2006) into a lower monthly payment, similar to what was originally promised."  *Id*. ¶ 42.  The Sherks relied on this "verbal agreement,"[17] and committed themselves to the 2005 loan.  *Id*. ¶¶ 43-44, 47, 57.  They contend that Countrywide and the mortgage broker defendants were "plac[ing] [them] in a loan that could ultimately be repaid."  *Id*. at 44.

In June 2006, the Sherks refinanced the December 2005 loan.  The new mortgage reduced the monthly payments to $2,700.  *Id.* ¶ 52.  The Sherks complain that the new monthly payments were "higher than the [$2,300] monthly payments [the Sherks] had been promised and still interest only despite Mortgage Broker's promise."  *Id*.  The Sherks reiterate that both Countrywide and the mortgage broker defendants "knew or should have

---

[15]  It is not clear which defendants are "Mortgage Brokers."  Only Vince Sirianni is defined as "Mortgage Broker"; Theresa Sirianni is defined as "President," and Bi-Weekly is defined as "Mortgage Brokerage."  We shall presume that "Mortgage Brokers" refers generally to defendants Bi-Weekly, Vince Sirianni and Theresa Sirianni.

[16]  The Sherks apparently believed that a loan for $15,000 more than originally discussed should not have changed the terms.

[17]  The Sherks do not allege that this agreement was ever memorialized in writing.  Nor do they allege who made this representation, when it was made, or how it was made.

known that the [sic] both the purchase and refinance loans were unaffordable to the [Sherks]." *Id.* ¶ 56; *see also id.* ¶ 59 (alleging that it "was represented" to the Sherks by an unspecified party that "the loan was to be affordable to [them]").

The Sherks also allege that they were forced to pay taxes that should have been included in the mortgage payments. They became aware of this when they "were personally served by Sheriff [sic] with notice of a real estate tax deficiency," which occurred "[i]n or around January 2007." *Id.* ¶¶ 53, 74. They do not state the amount of this deficiency, nor do they clarify whether the unpaid taxes cover the periods of both the 2005 and 2006 loans. According to the Sherks, they "were required to use their 401k [sic] and pensions to attempt to keep up with all property related payments," presumably including the deficient taxes. *Id.* ¶ 54.

Initially, the Sherks claim that, "[d]espite Mortgage Broker promising that every loan[18] would include [the Sherks'] real estate taxes," Countrywide advised them after they were served with the notice of deficiency that "Mortgage Broker had erred in failing to include taxes in the mortgage." *Id.* ¶ 53. The Sherks do not allege when or how such a promise was made. Indeed, it is not clear whether the mortgage included a provision for the payment of taxes, as the Sherks later allege that "[a]s part of [their] mortgage, an escrow account was created to pay [the Sherks'] taxes," but Countrywide "failed to pay [these] taxes as the terms of the mortgage required." *Id.* ¶¶ 73, 75.

Finally, with respect to the mortgage, the Sherks allege that a number of fees, including a "Yield Spread Premium," were not properly disclosed to them. *See id.* ¶¶ 66-

---

[18] While unclear, "every loan" apparently refers to at least the 2005 original loan and the 2006 refinance loan.

68.  Despite asserting that they entered into the loan transaction to purchase a more expensive property to avoid losing their down payment, the Sherks contend that if all information had been properly disclosed and explained to them, "the loans would not have closed, or, if they did, they would have closed upon more beneficial terms."  *Id*. ¶ 62; *see also id.* ¶ 71 (same).  The Sherks do not explain how any of the information allegedly withheld was material to their decision to enter into the loans.

The Sherks eventually defaulted on the 2006 loan.  They first allege that "the defaulted loan was sold by [Countrywide] through [MERS] to Holder," the identity of which is not defined in the complaint, and that these entities failed to properly "maintain[ ] and physically hold[ ] the Loan."  *Id*. ¶ 76.  A few paragraphs later, they allege that "[Countrywide] through [MERS] sold its interest in [the Sherks'] loan to Foreclosing Entity [HSBC] and Additional Foreclosing Entity [Alt-A]."  *Id*. ¶ 79; *see also id.* ¶¶ 15-16.  Confusing the roles of each defendant, they claim that MERS, not Countrywide, "unlawfully conveyed the loan, never having recorded  its interest nor the conveyance."  *Id*. ¶ 80.  They then allege that Countrywide "never legally assigned [their] loan."  *Id*. ¶ 84.

HSBC and Alt-A eventually initiated a mortgage foreclosure action against the Sherks in the Montgomery County Court of Common Pleas, No. 2008-04242.  *Id.* ¶¶ 86-87.  The Sherks assert that HSBC and Alt-A "should have been prevented from collecting on the loan including via foreclosure" as a result of the allegedly unlawful conveyance.  *Id*. ¶ 85.  "[A] default judgment was entered against [the Sherks], which resulted in a Sheriff's foreclosure Sale [sic]. . . on June 25, 2008."  *Id*. ¶ 90.

After the plaintiffs filed their second amended complaint, defendants Countrywide, MERS, HSBC, and Alt-A and defendants Bi-Weekly, Vince Sirianni and Theresa Sirianni

filed renewed motions to dismiss, arguing that the Sherks have failed to state any claim upon which relief can be granted.[19]  Gambone filed its first motion to dismiss in this action.

Defendants Countrywide, MERS, HSBC and Alt-A argue that the alleged violations of TILA and RESPA, which would be time-barred if stated as independent claims, cannot constitute claims under the UTPCPL.  Alternatively, they argue that, even if violations of TILA or RESPA were actionable as *per se* violations of the UTPCPL, the Sherks have failed to allege plausible violations under either of these statutes.  Second, they contend that the Sherks have likewise failed to state a claim under the UTPCPL's catch-all provision, which requires a plaintiff to allege justifiable reliance upon fraudulent or deceptive conduct.  Third, HSBC and Alt-A argue that the Sherks' claim under the FDCPA, which consists of nothing more than boilerplate allegations, is barred as a matter of law by the *Rooker-Feldman* doctrine.  Finally, HSBC and Alt-A contend that because the Sherks' claim under the FCEUA is based on conclusory allegations that FDCPA violations are *per se* violations of the FCEUA, it must fail for the same reason that the FDCPA claim fails.

Defendants Bi-Weekly, Vince Sirianni and Theresa Sirianni raise many of the same arguments as Countrywide, MERS, HSBC and Alt-A.[20]  They argue that the Sherks' UTPCPL claims are subject to dismissal for two reasons: (1) the Sherks fail to allege

---

[19] The plaintiffs' first and second amended complaints were each filed in response to motions to dismiss filed by each group of defendants.  *See* Mots. to Dismiss (Document Nos. 20, 21); Plfs' First Am. Compl. (Document No. 23); Mots. to Dismiss (Documents Nos. 25, 26); Plaintiffs' Second Am. Compl. (Document No. 40).

[20] The Sherks have filed a motion to strike the mortgage broker defendants' motion to dismiss, arguing that it makes *ad hominem* attacks on the Sherks' counsel. (Document No. 47).  The mortgage broker defendants' motion to dismiss points out that the complaint filed in this action closely resembles complaints filed by the Sherks' counsel in at least twenty-one other cases in the United States District Court for the Eastern District of Pennsylvania, a number of which have been dismissed for failure to state a claim upon which relief can be granted.  Defs.' Mot. at 3.  In light of the disposition of the motions to dismiss, it is not necessary to rule on the motion to strike.

sufficient facts to support this claim, and (2) violations of TILA and RESPA do not constitute *per se* violations of the UTPCPL.  They also argue that the Sherks cannot maintain TILA and RESPA claims under the guise of UTPCPL violations after representing to the court that these claims would be dismissed in their entirety if they were granted leave to file a second amended complaint.[21]

Gambone argues that the Sherks do not allege any misrepresentations or deceitful conduct by Gambone necessary to make out a claim under the UTPCPL.  Therefore, because the Sherks agreed to dismiss their claim for fraud and fraudulent misrepresentation against Gambone, the sole remaining claim against Gambone fails on its face.

### Motion to Dismiss Standard

When considering a motion to dismiss for failure to state a claim under Fed. R. Civ. P. 12(b)(6), all well-pleaded allegations in the complaint are accepted as true and viewed in the light most favorable to the plaintiffs.  *Phillips v. County of Allegheny*, 515 F.3d 224, 233 (3d Cir. 2008).  A complaint must contain a "short and plain statement of the claim showing that the pleader is entitled to relief," Fed. R. Civ. P. 8(a)(2), giving the defendant "fair notice of what the . . . claim is and the grounds upon which it rests."  *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544, 555 (2007) (quoting *Conley v. Gibson*, 355 U.S. 41, 47 (1957)).  Although this standard "does not require 'detailed factual allegations,' it demands more than an unadorned, the-defendant-unlawfully-harmed-me accusation."  *Ashcroft v. Iqbal*,

---

[21] Plaintiffs' Statement of Proposed Amended Complaint Per Order Entered April 23, 2009 (Document No. 37) requested leave to amend the first amended complaint given, in part, that the Sherks would be "entirely withdrawing" claims under "TILA/HOEPA and RESPA."

129 S.Ct. 1937, 1949 (2009) (quoting *Twombly*, 550 U.S. at 555).

There must be enough factual content from which the court can draw a reasonable inference that the defendant is liable.  The claim for relief must be "plausible on its face." *Twombly*, 550 U.S. at 570.  To reach this point in the analysis, a court must consider only those legal conclusions that are supported by factual allegations and disregard those that are not.

A complaint is subject to dismissal if the plaintiff fails to plead "factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Iqbal*, 129 S.Ct. at 1949 (citing *Twombly*, 550 U.S. at 556).  The plaintiff must allege facts that indicate "more than a sheer possibility that a defendant has acted unlawfully." *Id.*   The mere pleading of "facts that are 'merely consistent with' a defendant's liability" is insufficient and cannot survive a motion to dismiss. *Id.* (citing *Twombly*, 550 U.S. at 557).

## Discussion

The second amended complaint, the Sherks' third attempt to state a claim in this action, is insufficient.  It fails to clearly state which defendants allegedly committed which acts or when such acts were committed.  In other words, it fails to contain sufficient factual content to support the legal claims asserted.[22]

---

[22]   *See, e.g.*, 2d Am. Compl. ¶ 23 ("Hereinafter, Defendants, Foreclosing Entity, Nominee, and Additional Foreclosing Entity, will be collectively referred to as, [sic] Defendants, "Holder(s)" or "Assignee(s)"); *id.* ¶ 69 (claiming that certain fees "were not seen or revealed to Plaintiffs until closing, if ever, at which point same [presumably referring to fees], if they were disclosed, are intentionally concealed within the morass of loan documents which Plaintiffs were directed to execute without further explanation."); ¶ 70 ("improper payments or disclosures may include but are not limited to those above and below mentioned."); ¶ 76 ("Thereafter the Closing and Plaintiffs' default, the defaulted loan was sold by Originating Lender through Nominee to Holder, who are liable therefore and thereunder by written agreement and as a matter of law.").

### FDCPA v. HSBC and Alt-A

The FDCPA "provides a remedy for consumers who have been subjected to abusive, deceptive, or unfair debt collection practices by debt collectors." *Pollice v. Nat'l Tax Funding, L.P.*, 225 F.3d 379, 400 (3d Cir. 2000) (citing *Zimmerman v. HBO Affiliate Group*, 834 F.2d 1163, 1167 (3d Cir.1987)). Therefore, to state a claim under the FDCPA, the plaintiff must allege that the defendant's attempt to collect on a debt involved prohibited practices. *Id.* (citing *Zimmerman*, 834 F.2d at 1167; 15 U.S.C. §§ 1692e-f).

The Sherks allege that HSBC and Alt-A violated the FDCPA by (1) "threatening or communicating false credit information including the failure to communicate that a debt is disputed"; "giving a false impression of the character or legal status of the debt"; "using false or deceptive collection methods"; and "threatening or communicating false credit information." 2d Am. Compl. ¶¶ 101-104. These bare allegations are mere conclusions. The only factual allegation is that HSBC and Alt-A failed to secure a valid assignment of the loan, thus depriving them of standing to collect or foreclose on the loan. *Id.* ¶¶ 84-86. In other words, the Sherks argue that because HSBC and Alt-A did not legally own the mortgage, they could not make demands for payment and initiate legal action to collect the debt.[23]

At oral argument, Sherks' counsel confirmed that the entire basis for the FDCPA cause of action rests on the Sherks' contention that the assignment of the mortgage was invalid. It is not clear, however, whether the Sherks contend that the state court

---

[23] Without deciding whether collecting and foreclosing on a debt that was allegedly not properly assigned constitutes a practice prohibited by the FDCPA, we shall assume it does for purposes of deciding the motion to dismiss.

erroneously entered judgment in favor of HSBC and Alt-A or whether the Sherks are arguing that HSBC and Alt-A procured the foreclosure judgment through fraud committed before the judgment was entered.  To the extent the Sherks seek to appeal the state court's judgment by arguing that it was erroneously entered, their FDCPA claim is barred by the *Rooker-Feldman* doctrine.  To the extent they seek to argue that they were harmed by the defendants' conduct, the claim is barred by the Pennsylvania preclusion doctrine.

The *Rooker-Feldman* doctrine bars "cases brought by state-court losers complaining of injuries caused by state-court judgments rendered before the district court proceedings commenced and inviting district court review and rejection of those judgments."  *Exxon Mobil Corp. v. Saudi Basic Indus. Corp.*, 544 U.S. 280, 284 (2005).[24]  Federal district courts lack subject matter jurisdiction over an action seeking to appeal and reverse a state court decision.  *See id.* at 293.  Therefore, a federal court may not consider a claim that would require either determining that the state court judgment was erroneously entered or reversing the state court's judgment.  *In re Knapper*, 407 F.3d 573, 581 (3d Cir. 2005).

Whether HSBC and Alt-A had the legal right to foreclose on the mortgage loan has been determined in state court and cannot be reconsidered by a federal court.  Having lost in state court, which entered a default judgment against them in the foreclosure action brought by HSBC and Alt-A, the Sherks cannot now complain of any injury caused by that state court judgment or ask this court to grant them relief that would nullify that judgment.  *Exxon Mobil Corp.*, 544 U.S. at 284; *Knapper*, 407 F.3d at 580.  In other words, the Sherks

---

[24]  The *Rooker-Feldman* doctrine is based on two decisions by the United States Supreme Court in *Rooker v. Fidelity Trust Co.*, 263 U.S. 413 (1923) and *District of Columbia Court of Appeals v. Feldman*, 460 U.S. 462 (1983).  It is limited to "the contours of the *Rooker* and *Feldman* cases."  *Exxon Mobil Corp.*, 544 U.S. at 283.

may not seek relief that requires a predicate finding that the state court's action resulting in the entry of a judgment was wrongfully entered.  *See Laychock v. Wells Fargo Home Mortgage*, Civil Action No. 07-4478, 2008 WL 2890962, at *3 (E.D. Pa. July 23, 2008) (Sanchez, J.) (finding the *Rooker-Feldman* doctrine barred identical FDCPA claim asserted by the plaintiffs, also represented by the Sherks' counsel); *Andrew v. Ivanhoe Fin., Inc.*, Civil Action No. 07-0729, 2007 WL 2844937, at **4,8 (E.D. Pa. Sept. 28, 2007) (Baylson, J.) (same).

To the extent the Sherks argue that they were harmed by the fraudulent conduct of HSBC and Alt-A prior to the entry of judgment in state court, their claim is barred by Pennsylvania's preclusion doctrine.  A federal court must give a state court judgment the same preclusive effect that the state court would give it.  *Lance v. Dennis*, 546 U.S. 459, 466 (2006); *Turner v. Crawford Square Apartments III, L.P.*, 449 F.3d 542, 548 (3d Cir. 2006).  In Pennsylvania, principles of *res judicata* bar the relitigation of any claims between parties or their privies upon which a final, valid judgment on the merits has been entered by a court with the authority to adjudicate those claims.  *Balent v. City of Wilkes-Barre*, 669 A.2d 309, 313 (Pa. 1995).  Furthermore, "[*r*]*es judicata* applies not only to claims actually litigated, but also to claims which could have been litigated in the first proceeding if they were part of the same cause of action."  *Id*.

HSBC and Alt-A's legal standing to bring the foreclosure action has been established.  Judgment in their favor has been entered.  The time and the place to challenge standing was during the pendency of the foreclosure action or afterwards in the state court where the Sherks could have raised the issue.  Sherk's counsel conceded at oral argument that his clients could have raised the issue of whether HSBC and Alt-A

lacked standing because they procured the mortgage through an illegal or fraudulent assignment during the mortgage foreclosure proceedings.   Indeed, they could have defended the foreclosure action in state court, but chose not to do so.  They also could have petitioned to open the judgment pursuant to Pa. R. Civ. P. 237.3.  Having failed to take either step in the state court, the Sherks cannot now relitigate the same issue in federal court.  Therefore, to the extent they seek relief to remedy injury caused by the defendants prior to the entry of judgment in state court, their FDCPA claim is barred by Pennsylvania preclusion law.

### FCEUA v. HSBC and Alt-A

Fashioned after the FDCPA, Pennsylvania's FCEUA prohibits "unfair methods of competition and unfair or deceptive acts or practices with regard to the collection of debts." 73 Pa. Stat. Ann. § 2270.2; *Connolly v. Reliastar Life Ins. Co., Inc.*, Civil Action No. 03-5444, 2006 WL 3355184, at *9 (E.D. Pa. Nov. 13, 2006) (Joyner, J.).   It is Pennsylvania's counterpart to the FDCPA.  *Gigli v. Palisades Collection, L.L.C.*, Civil Action No. 06-1428, 2008 WL 3853295, at *11 (M.D. Pa. Aug. 14, 2008) (Vanaskie, J.).  As such, the Sherks argue that "[v]iolations of the FDCPA are a per se violation [sic] of the FCEUA." 2d Am. Compl. ¶ 108.

According to the Sherks, HSBC and Alt-A violated the FCEUA by (a) "[u]sing unfair and unconscionable collection methods; (b) "[g]iving a false impression of the character, amount or legal status of the alleged debt; (c) "[u]sing false and deceptive collection methods; (d) "[m]aking threats and taking illegal action; and (e) "[o]therwise using false, deceptive, misleading, and unfair and unconscionable means to collect or attempt to collect a debt."  *Id*. ¶ 109.  These conclusions, unsupported by sufficient factual allegations, fail

14

to state a claim upon which relief can be granted.

As in the FDCPA claim, the only factual allegation against HSBC and Alt -A is that they lacked authority to collect or foreclose on the loan.  Indeed, at oral argument, Sherks' counsel admitted that the basis for the cause of action under the Pennsylvania FCEUA was the same as for the federal FDCPA.  For the same reasons their claim under the FDCPA fails, so does their cause of action under the FCEUA.

### UTCPCL v. All Defendants

The UTPCPL protects consumers who suffer "any ascertainable loss of money or property, real or personal" caused by fraudulent or deceptive conduct prohibited by the statute.  73 Pa. Cons. Stat. § 201-9.2 (2008).  The statute lists twenty specified "unfair methods of competition" and "unfair or deceptive acts or practices," and includes a catch-all provision proscribing "any other fraudulent or deceptive conduct which creates a likelihood of confusion or of misunderstanding."  73 Pa. Cons. Stat. §§ 201-2(4)(i)-(xx), 201-2(4)(xxi); *Hunt v. U.S. Tobacco Co.*, 538 F.3d 217, 221 (3d Cir. 2008).

The Sherks assert a claim against all defendants under the UTPCPL based upon alleged violations of TILA and RESPA.  Initially, they brought these claims under these federal statutes independently of the UTPCPL.  After motions to dismiss those causes of action on statutes of limitations grounds were made, the Sherks filed the second amended complaint, which no longer asserted the claims as independent causes of action; but, instead, to avoid the time bar and because the Sherks could not maintain a claim under TILA because they no longer owned their mortgaged home, they included violations of TILA and RESPA, which "inure to [d]efendants' liability under the UTPCPL" as part of their UTPCPL claim.  2d Am. Compl. ¶ 100.  To avoid the defendants' statute of limitations

15

argument, the Sherks have attempted to revive their expired TILA and RESPA claims by casting them as unfair practices under Pennsylvania law rather than stating them as independent federal causes of action.

The Sherks have offered no legal authority for the proposition that violations of TILA or RESPA constitute *per se* violations of the UTPCPL.[25]  Even if violations of TILA or RESPA could be considered violations of the UTPCPL, however, the Sherks have failed to state a claim under either statute.  The Sherks cannot circumvent the statute of limitations applicable to these federal statutes by masquerading them as unfair and deceptive acts under the UTPCPL, which has a longer statute of limitations.  *See Morilus v. Countrywide Home Loans, Inc.*, Civil Action No. 07-900, 2008 WL 5377627, at *13 (E.D. Pa. Dec. 22, 2008) (Stengel, J.) (denying similar effort by the Sherks' counsel to bring TILA and RESPA claims under the UTPCPL (citing *Christopher v. First Mutual Corp.*, Civil Action Nos. 05-0115, 05-1149, 2007 WL 815300, at *15 (E.D. Pa. Apr. 22, 2008) (Shapiro, J.))).

The statute of limitations has clearly run on any of the Sherks' possible claims for damages under TILA and RESPA, both of which are governed by a one-year statute of limitations.  *See* 15 U.S.C. § 1640(e); 12 U.S.C. § 2614.  The statute of limitations began to run when the Sherks became contractually obligated under the 2005 loan on December 15, 2005, and the 2006 loan on June 5, 2006.  *See Roche v. Sparkle City Realty*, Civil Action No. 08-2518, 2009 WL 1674417, at *2 (E.D. Pa. June 12, 2009) (Kauffman, J.); *Kemezis*, 2008 WL 2468377 at *4.  The Sherks did not file this action until December 24, 2008, over three years after the 2005 loan and over two and a half years after the 2006

---

[25]  Contrary to the Sherks' Opposition, none of the cases cited by the Sherks stand for the position that a violation of TILA or RESPA constitutes a *per se* violation of the UTPCPL.

loan.  Accordingly, any claims brought under TILA and RESPA are time-barred.[26]

In an attempt to avoid this legal hurdle, the Sherks state that "[t]his action may rely on the 'Discovery Rule' and the Doctrine(s) of Equitable Tolling/Fraudulent Concealment." 2d Am. Compl. ¶ 5.  Equitable tolling is appropriate when the plaintiffs would be prevented from asserting their claims due to: (1) fraudulent concealment of those claims by the defendants; (2) extraordinary circumstances; or (3) having filed timely claims in the wrong forum.  *Lake v. Arnold*, 232 F.3d 360, 370 n. 9 (3d Cir. 2000).  The Sherks have offered no facts that could fall into either of these categories.  Because they refer broadly to "fraudulent concealment," we shall determine if they have made sufficient allegations to toll the statute of limitations.

To toll the statute of limitations under the doctrine of fraudulent concealment, the Sherks must allege facts that (1) the defendants actively misled them; (2) thus preventing them "from recognizing the validity of [their] claim[s] within the limitations period"; and (3) their "ignorance is not attributable to [their] lack of reasonable due diligence in attempting to uncover the relevant facts."  *Cetel v. Kirwan Fin. Group, Inc.*, 460 F.3d 494, 509 (3d Cir. 2006) (citing *Mathews v. Kidder, Peabody & Co., Inc.*, 260 F.3d 239, 256 (3d Cir. 2001)).  The Sherks have not made any of these required allegations.[27]  Significantly, they did not argue in opposition to the motions to dismiss that their claims should be tolled.  The mere statement that the doctrine of equitable tolling "may" apply is plainly insufficient.

---

[26] The statute of limitations is an affirmative defense that can be considered in a Rule 12(b)(6) motion to dismiss when the defect appears on the face of the complaint.  *Robinson v. Johnson*, 313 F.3d 128, 135 (3d Cir. 2002).

[27] Having failed to make any allegations to support their claim that fraudulent concealment may apply, the Sherks have not met the standards of Fed. R. Civ. P. 9(b), which requires that all allegations of fraudulent concealment be pleaded with particularity.  *See Kemezis*, 2008 WL 2468377 at *4.

The Sherks argue that the one-year statute of limitations applicable to claims under TILA and RESPA would not apply because their claims are "brought in response to foreclosure" and thus sound in recoupment.  Plfs' Opp. (Doc. No. 46) at 7.  Recoupment is a defense and not an affirmative claim for relief.  *Roche*, 2009 WL 1674417 at *2.  It "cannot be the basis for asserting an independent claim."  *In re Flagstaff Realty Assocs.*, 60 F.3d 1031, 1035 (3d Cir. 1995).

Even if the Sherks' TILA and RESPA claims were not barred by the statute of limitations, these claims still cannot be brought under the UTPCPL.  The Sherks essentially seek to assert indirectly federal causes of action that "have different requirements" and "grant different types of relief" than the UTPCPL, a state statute.  *McMaster v. CIT Group/Consumer Fin., Inc.*, Civil Action No. 04-339, 2006 WL 1314379, at *10  n.11 (E.D. Pa. May 11, 2006) (O'Neill, J.).  Claims under TILA and RESPA can only be asserted independently.  *See Christopher*, 2008 WL 1815300 at *15.

In attempting to state a claim for conduct proscribed by the UTPCPL, the Sherks recite statutory language describing prohibited practices.  They do not specify any particular act or practice of the defendants that fits into any of the categories of prohibited conduct under the UTPCPL.  Mere recitations of statutory language are insufficient.

In the second amended complaint, the only defendants upon whose action the Sherks allegedly relied were the mortgage broker defendants.  The Sherks allege that they "detrimentally relied upon [Vince Sirianni] to cause to be made a loan which represented to be the best possible terms for [the Sherks]."  2d Am. Compl. ¶ 58.  The Sherks do not allege that either loan failed to incorporate the best possible terms then available.  Instead, they allege that the loans were unaffordable or not beneficial.  This allegation does not

mean that the loans were not the best possible ones available at the time.  Thus, there is no unfair or deceptive act or practice alleged.

 With respect to Gambone, the Sherks allege that they signed an agreement of sale and paid a down payment "[t]o reserve the lot" they originally wanted to purchase.  2d Am. Compl. ¶ 30.  While they were seeking "purchase financing for the remaining amount due," Gambone sold that lot to another buyer.  *Id*. ¶¶ 31, 33.  The Sherks, however, do not allege that they relied on any deceptive or fraudulent conduct by Gambone when they decided to enter into the agreement of sale and pay the deposit money.

The Sherks also do not allege that Gambone's refusal to refund the Sherks' "approximately $15,000-$20,000" down payment fraudulently or deceptively induced them to purchase the property they ultimately bought.  Rather, they allege that they purchased this property, which was more expensive than the lot they originally sought to purchase, because they could not afford to lose their down payment.  Finally, the Sherks do not allege that Gambone deceived them into entering into the 2005 or 2006 loan.[28]  Indeed, it appears that Gambone had no involvement with either loan.  The Sherks' claim against Gambone is unrelated to any of the claims against the other defendants in this action, which the Sherks characterize as one for "predatory lending."

Finally, with respect to the other defendants, including Countrywide, MERS, Alt-A, and HSBC, there are no allegations of any unfair or deceptive communications between

---

[28]  When asked at oral argument to identify any misrepresentation by Gambone, Sherks' counsel declined to do so.  Despite withdrawing the fraud and fraudulent misrepresentation claims, however, the Sherks continue to assert a UTPCPL claim against Gambone.

19

the Sherks and any of these defendants prior to entering into the loans at issue.[29]  Absent some allegation of deceptive or fraudulent conduct on the part of these defendants *prior* to the Sherks' decision to enter into the loans, the Sherks cannot show justifiable reliance. Instead, they allege they did so to avoid losing their down payment.  Accordingly, the Sherks' UTPCPL claim must be dismissed against all defendants as they have failed to state a claim upon which relief can be granted.

### The Sherks Will Not Be Permitted to Amend The Complaint

Plaintiffs must be allowed to amend "unless an amendment would be inequitable or futile." *Phillips v. County of Allegheny*, 515 F.3d 224, 236 (3d Cir. 2008) (citing *Grayson v. Mayview State Hosp.*, 293 F.3d 103, 108 (3d Cir. 2002)).  The Sherks have already filed two amended complaints.  Neither of them improved upon the original complaint.  Nothing the Sherks could add or clarify in a fourth attempt could make out a cause of action under the FDCPA.  Because that is the only federal cause of action asserted and there is no diversity jurisdiction, there would be no basis for federal subject matter jurisdiction. Therefore, amendment would be futile.

### Conclusion

The Sherks have failed to state a claim under the FDCPA, FCEUA, or UTPCPL. The second amended complaint, which consists almost entirely of conclusory allegations without any meaningful factual content, is insufficient.  Accordingly, all claims against all defendants will be dismissed and this action will be dismissed.

---

[29] There are no allegations that any of the defendants other than Gambone Construction was involved in the sale of the property purchased by the Sherks with the 2005 loan and refinanced with the 2006 loan.